**CLIFTON et al. v. CHICAGO, R. I. & P. R. CO. et al.**

**Civ. A. No. 2340.**

United States District Court
W. D. Louisiana, Monroe Division.

Dec. 23, 1948.

W. T. Holloway, of Jonesboro, La., and James D. Sparks, of Monroe, La., for plaintiffs.

Allen B. Guthrie, of Ruston, La., for defendant.

DAWKINS, Chief Judge.

Plaintiffs, as the sole legal heirs, claim the sum of $43,309.00 as damages, alleged to have been caused by the negligent kill-

ing of their mother, Mrs. Cora Clifton, by one of defendant's trains. Plaintiffs are both of age and the mother at the time of her death was 73 years old.

The petition states that the deceased was proceeding in a northerly direction on the east side of defendant's track, along a path used by the public at the ends of the ties, with her back to the approaching train, and that the whistle was blown "approximately four or five hundred yards from the point where the deceased was struck, although, he, (the engineer) could have seen the deceased several hundred yards down the track", which "was straight for at least a distance of one-half mile south to the point where the accident occurred" with "no obstructions of view."

The alleged negligence consisted of: running the train "between forty and fifty miles per hour" over a public crossing, near a public high school and into the village of Quitman, with full knowledge by the employees of defendant of the constant use by the public of the track and path along the ends of the cross-ties; that there was not sufficient space to permit a pedestrian to step aside and avoid being hit, due to the presence of a ditch and heavy growth of bushes therein, etc.; that deceased because of her age, was infirm, feeble and somewhat hard of hearing, which were apparent to the engineer on the approaching train, because when he blew the whistle, some 1200 to 1400 feet away, he noticed she paid no attention to it, yet he continued his speed unchecked until within a distance from the deceased at which the train could not be stopped, even in emergency; that, too late, the whistle was blown in short blasts, and heard for the first time by deceased, who looked around, saw the train, and started to run for the crossing, in the hope of getting out of the way; that this was made necessary because of conditions along the east side of the track; and she was struck before she was out of danger. Further, that the engineer, at the point where the accident occurred, due to the conditions stated, should have brought his train under control, reduced the speed, rung his bell and blown his whistle continuously, and kept proper lookout for persons using said path; that "decedent had

a legal right to be on the property; that she was not a trespasser; and that had the engineer been using due care and caution he could have stopped the train and avoided the accident * * *".

These allegations necessarily disclose that the deceased entered a perilous situation, where she was bound to know that a train might approach at any time, from either direction, and which could not be seen from her back unless she stopped and looked around at intervals as she travelled the distance of several hundred feet, after she entered on the railroad right of way on a trip to the village of Quitman, where, it developed, she was going to mail letters.

So, the matter is thus reduced to a single legal proposition, and that is, do the facts developed on the trial show by a fair preponderance that the defendant had the last clear chance to avoid the collision after discovering, or by the use of reasonable care the engineer should have discovered the danger of decedent brought about by her own negligence?

The engineer testified without contradiction, that the speed of his train in the open country was about 45 miles an hour, made necessary to meet a schedule of an average of about 34 miles an hour, including some 24 stops on the 100 miles from El Dorado, Arkansas, to Winnfield, Louisiana. In this instance, however, he testified at first, "I was going 30 miles an hour and then I made a service application to get my brakes adjusted to make a station stop (about one-half a mile or some 2640 feet from the station at Quitman), and when she didn't heed the whistle, she looked around and saw me, and when she saw me, she started running and I put my brakes on in emergency and then when I couldn't stop, the baggage car was on the crossing and the coach was beyond the crossing". However, in answer to the very next question, when asked how much his speed had been reduced, when he "saw Mrs. Clifton was not going to move away from the track", he answered: "I cut down about 35 miles an hour" (five miles more than he said he was making when the service application was made at the trestle). He was next asked: "And how far were you beyond Mrs. Clifton about that time?"

(meaning, presumably, when he saw she was not going to get away from the track) and he replied: "About 600 feet." He then "put the brakes in emergency and commenced blowing the whistle, trying to attract her attention that she was in danger, and I blew the whistle up until I struck her." He then stated he was going "about 15 or 18 miles an hour when I struck her."

The train consisted of a diesel engine and two coaches, one of which was a combination baggage car. The engineer testified it required seven seconds to get full application of the brakes in an emergency, and about 4 seconds to get "some effect". He also said that when he first saw the deceased, because of the curve in the track (which is supported by the photographs), he could not tell whether she was on the track or beside it. However, he was undoubtedly familiar with the fact that the public constantly used this stretch of track, and with the conditions on the side thereof. It is also shown that one not excited and in possession of his faculties could have stepped aside a few inches and been missed by the train without going into the ditch, which was overgrown with bushes, etc., but when confronted, as was the deceased in this case, with what she must have considered sudden peril, the law does not hold her to the same degree of responsibility for the course she chose as when acting without such excitement. On the other hand, as testified to by the engineer, in order to make the schedule he had to continue with little or no reduction in speed in passing through these small places, unless he had a passenger to let off, or one flagged to get on the train. However, he did say that Quitman was a regular stop, meaning, it is assumed, that the train always stops there. This is further supported by the testimony referred to above that he had "made a service" application of the brakes, for the purpose of stopping at the Quitman station. When an engineer discovers a human being walking down a track with his back to the approaching train, the former may reasonably assume that the person will hear and respond to a warning whistle, such as the plaintiffs allege was given in this instance. The engineer had no way of knowing the decedent was hard of hearing or otherwise other than normal until developments reasonably disclosed she had not heard the signals. Plaintiffs' witnesses measured the distance from the trestle where deceased had been struck and found it between 1000 and 1100 feet. The engineer says that it takes about 600 or 700 feet to stop going at 35 miles an hour and that at 25 miles he could stop within 200 feet by applying full emergency.

When reduced to its true meaning, the engineer's testimony amounts to this, that, he used only the service application of his brakes to make the ordinary stop, about one-half a mile before reaching it, when he was travelling in the longest curve on the line, approaching a frequently used crossing, near a public school, with knowledge of the fact that the track and the path on its east side, with the conditions existing there, was being used constantly by the public as a passageway. He further says that he saw the decedent when he was about even with the trestle, although, because of the curve, he could not tell whether she was on the track or beside it; yet, he did not deviate from the procedure for an ordinary station stop, but simply blew the whistle at the customary point and made the service application of his brakes, knowing that this would reduce his power to stop in an emergency. Therefore, after careful consideration of all these circumstances it is concluded that the engineer did not use that high degree of care which the circumstances required. Had he done so and brought this light train under better control, he could have, by using the facilities at his command, stopped and avoided hitting deceased, 400 feet away.

The conclusion is that his failure in this respect was the proximate cause of the accident rather than the carelessness of this aged woman in walking into the trap from which she was unable to extricate herself in her excitement after becoming aware of her peril. Her negligence was spent. Yet, by the exercise of reasonable care, the engineer could notwithstanding, have avoided striking her. Russo v. Texas & Pacific R. Co., 189 La. 1042, 181 So. 485, and authorities cited.

Quantum of Damages.

The deceased was 73 years of age and had at best only a few years of life expectancy. She contributed nothing to the plaintiffs, but on the other hand, they supported her, so that the only elements to be considered in determining the amount of recovery are: (1) the pain and suffering of the deceased, the claim for which passed to the plaintiffs at her death and (2) their grief and loss of companionship at the death of their mother, etc. It is believed the sum of $2500 will suffice to compensate for these items.

Proper decree should be presented.